Filed 5/23/16  P. v. Williams CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B259888 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA130465) |
| v. | |
| KELVIN WILLIAMS et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant Kelvin Williams.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Tyrelle Smith.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Defendants Kelvin Williams and Tyrelle Smith appeal from the judgment after their convictions for first degree murder of one victim (Pen. Code, §§ 187, subd. (a), 189) and the attempted willful, deliberate, and premeditated murders of two other victims (§§ 187, subd. (a), 189, 664).[1] Between the two of them, they raise 11 contentions of error, and each joins in the other's arguments that may accrue to his benefit. Respondent raises one error relating to the calculation of presentence custody credits. We modify the judgment to correct the presentence custody credits but otherwise affirm.

**FACTS**

The Los Angeles Police Department (LAPD) received numerous calls regarding gang fights in the area of 91st and San Pedro Streets during the month of August 2013. The Main Street Crips gang claimed that area as its territory. "DEA" is a clique or subset within the Main Street Crips. Both defendants belonged to the DEA clique. Smith's gang moniker was "Dulo" or "D." Williams's gang moniker was "Infant D-Hog" or "Infant." Smith's brother also belonged to DEA.

Main Street Crips was feuding with the 92 Hat Gang Watts Crips (Hat Gang) in August 2013. Deshawn Dixon, the murder victim in this case, was a member of the Hat Gang. Thomas Turner and Edward Thomas, the attempted murder victims in this case, were also Hat Gang members. As part of the feuding during that period, Dixon had "jumped" Smith's brother. Hat Gang members had also shot at Smith's brother.

On August 27, 2013, LAPD officers responded to a report of a shooting at 91st and San Pedro Streets at approximately 10:00 a.m. They found Dixon lying on the ground with a gunshot wound to his abdomen. An ambulance transported Dixon to the hospital, where he died approximately two hours later.

On appeal, there is no dispute that Smith and Williams went to the location of the shooting together or that Smith personally used a firearm to shoot Dixon from a car in which Williams was also riding. There is also no dispute that Turner was very near

_____

[1] Further undesignated statutory references are to the Penal Code.

Dixon, and Thomas was, at the least, in the vicinity of Dixon. Defendants' arguments relate mostly to their state of mind on that day, whether they had the intent required for their convictions, and whether there was evidence of perfect or imperfect self-defense. They presented no affirmative evidence in their defense. The facts we set forth come from the prosecution's case.

## 1. Robin Johnson

On the morning of August 27, 2013, Smith was with his girlfriend of three years, Robin Johnson. They were driving in his car on San Pedro Street in the area of 92nd Street when two men on foot "mad-dogged" Smith, or gave him dirty looks. Smith returned the dirty looks. Smith, who was driving, turned on 94th Street and told Johnson he was going to pick up Williams so they could fight. Smith kept the car running as he stopped in front of Williams's house and yelled his name. Williams came out of his house, and Smith shouted at him to "grab the thing." Johnson asked him what he meant by the "thing." Smith said, "A gun."[2] Johnson told him she was scared; he did not respond. Still, Johnson thought they were just going to fist fight, not kill someone.

Williams went back inside the house and came out again. Johnson did not see anything in his hands when he came out this second time. She never saw Williams give anything to Smith or put anything in the glove compartment. But she also never saw Williams lift his shirt and could not say whether he had anything in his waistband.

Williams got into the backseat behind Johnson (who was the front passenger). Smith told Williams they were "going to go fight." He drove back to San Pedro and 94th Streets and parked alongside the curb. Both he and Williams exited the car and walked away. Johnson stayed in the front passenger seat and talked to a friend sitting on the sidewalk. Smith returned and reached through the passenger window for the glove compartment. Johnson did not see whether he took anything out. She was concerned

---

**2** At the preliminary hearing, Johnson said she did *not* ask Smith what he meant by "the thing."

3

something bad might happen, but she did not see Smith take anything because her seat was laid back and she was looking toward her friend on the sidewalk. She told officers that she saw Smith put something in his waistband then, but at trial she did not remember seeing that.

After reaching into the car, Smith ran north toward 91st Street. Johnson's friend told her to "get him" before he got "himself into some mess." Johnson got into the driver's seat and followed Smith in the car. She yelled at him to get in the car, but he ignored her. She was nervous and afraid "something [was] happening." Because Smith was not listening to her, she drove past him and tried to catch up with Williams.[3]

Johnson found Williams on San Pedro Street between 92nd and 91st Streets, yelling and cursing at the two men who had given Smith dirty looks. Smith was nearby talking to someone on a bike. She made one or two U-turns on San Pedro Street as she was trying to convince Williams and Smith to get in the car. They both got into the car at 92nd Street and she immediately started driving north toward 91st Street. Smith sat in the passenger seat and Williams in the backseat on the passenger side. Smith rolled down his window, and she heard him "click the gun back." Johnson told him, "Please don't do it." But he put his arm out the window and started shooting before the car had reached 91st Street. Johnson heard multiple shots and then looked at the passenger's side rear-view mirror. She saw one man on the ground and another standing next to him.

Johnson did not see anybody on the street with a gun, either when Smith was shooting or afterward when she looked in the mirror, nor did she hear any shots fired in her direction. When Detective Nathan Kouri of the LAPD interviewed her months later, she told him she saw members of the Hat Gang coming from a yard and digging in their

---

**3** LAPD obtained surveillance video of San Pedro Street from a liquor store on the corner of San Pedro and 93rd Streets. Consistent with Johnson's testimony, the video showed defendant Williams walking northbound on San Pedro Street to 91st Street, and approximately 30 seconds later, Smith running the same direction with his right hand at his waistband. The video also showed Smith's car driving away from the curb and following Smith as he ran down the street.

pants pockets like they were reaching for something. At trial, she denied that she saw them coming from a yard or digging in their pockets.

After the shooting, Johnson was scared and stopped the car after driving away from the scene. She told Smith, "I don't want to have nothing to do with this," exited the car, and walked to her brother's house. She was scared to contact police and did not break up with Smith. The police arrested her and Smith on October 15, 2013. Officers found the shirt Smith wore on the day of the shooting at her house.

When Detective Kouri interviewed her after her arrest, she denied being at the shooting for the first hour or so of questioning. She eventually relayed the true facts as she stated them at trial, because she became worried that her unborn child would be taken from her otherwise. She was two to three months pregnant. At some later date, prosecutors offered her a plea agreement in exchange for her truthful testimony. But she would have testified truthfully even if they had not offered her a plea agreement; she felt it was the "the right thing to do." She pled guilty to accessory after the fact with a gang enhancement. The court had not yet sentenced her.

### 2. Thomas Turner

Turner (one of the attempted murder victims) lived on San Pedro Street near the 91st Street intersection. His house was three or four houses north of the corner of San Pedro and 91st Streets. Officers found Dixon in front of the house neighboring Turner's. The prosecution subpoenaed Turner to testify, but he refused to even let the clerk swear him in.

Detective Kouri interviewed Turner three times after the shooting, including once on the day of the shooting. The pair of shorts he wore on that day had two holes in it. Detective Kouri searched Turner's home on the day of the shooting. He recovered a .22-caliber gun from his bedroom.

### 3. Edward Thomas

Thomas (the second attempted murder victim) testified in the prosecution's case. The prosecution also subpoenaed Thomas. He admitted that he did not want to testify, but he did nevertheless. His testimony at trial differed in many respects from his

5

statements to police and to another witness—Katrina Shaw—made right after the shooting.

Detective Kouri interviewed Thomas on the day of the shooting. During that interview, Thomas suggested he was standing at the corner of San Pedro and 91st Streets when shots were fired. (He insisted at trial that the statement "came out wrong" because there were some parts of the interview the detective did not record.) No one in the group returned fire at the car. The shooter fired six to seven shots from the car.

At trial, Thomas said he was inside Turner's house watching television on August 27, 2013, when he heard gunshots, which prompted him to run outside. The shooting was still happening when he came outside, and Turner and Dixon were near the corner. He made it to the gate and then turned around and ran back toward the house. Thomas did not know if anyone in the group returned fire at the car. Turner and Dixon were also running away from the shooter back to Turner's house. Dixon did not make it back to the house. He did not see Turner come into the house and get a gun before the shooting started, and he never saw Turner in possession of a gun when he went outside. He denied speaking to Shaw at all about the shooting. He said Detective Kouri forced him to say the things he said during the police interview. The detective, for his part, denied that he forced Thomas to say anything during the interview.

### 4. Katrina Shaw

Shaw is a cousin of Dixon's mother. She was close to Dixon. She gave a statement to the police two days after the shooting. Thomas told her what happened the day of the shooting. His account to Shaw was as follows.

Thomas, Turner, and Dixon stayed at Turner's house the night before the shooting. When they woke up the next morning, Dixon and Turner went to the corner store and returned at a run because two men were chasing them. Turner, who was hot-headed, was mad. He got a gun and went outside. Dixon followed him outside to try to calm him. Thomas said he also went outside when Dixon and Turner went. A car pulled up with "Infant" and "D" inside, the same men who had just chased Dixon and Turner. Both men in the car shot at them. ("[O]ne shot, then the other one shot.") The shooters were from

6

the DEA gang. Dixon had previously fought with one of the two shooters, but Shaw was not clear on which one.

## 5. *David Cathy*

David Cathy is Smith's cousin. At trial, Cathy took the oath and, after indicating Smith was his cousin, refused to testify further. The court warned him it would hold him in contempt. He agreed to accept the consequences but returned the next court day of his own volition and testified further. Cathy was in custody on November 24, 2013, after a parole search at his residence. He denied that officers interviewed him on that date. He also denied being a gang member. He never told officers that he knew something about a murder involving Smith. The prosecution played selected portions of a recorded interview with Detective Yung Mun to impeach him, and Cathy denied making the statements on the recording. In fact, he denied that it was his voice at all on the recording. He did not know who was talking to the detective on the recording. He acknowledged that the prosecutor and Detective Kouri visited him the week before he testified, and when the prosecutor told him she intended to call him, he cried and said he would not testify.

Detective Mun testified later about the information he received from Cathy. He and his partner recorded an interview with Cathy on November 24, 2013. The interview occurred at Cathy's request. At the time, Cathy was in custody and had been arrested for reasons unrelated to the shooting. He told jailers that he had information he was willing to give in exchange for help on his case. But the detectives never offered him anything in exchange for his information. They told Cathy his information had to be corroborated before anything was offered to him, and they would pass the information to the investigating officers on the case. Cathy was cooperative throughout the interview.

Cathy told the detectives he had information about a "murder" involving Smith, his partner Johnson, and Infant. His information was as follows. Smith was a member of Main Street Crips, as was Cathy himself. People in the gang looked up to Smith. The murder victim was from the Hat Gang. The Hat Gang had been feuding with Smith's brother, also a Main Street Crips member. The Hat Gang had "jumped" and shot at

7

Smith's brother. Smith said he "ain't going for none of that" and he "ain't doing no playing."

Smith had Infant with him on the day of the shooting. Infant asked him, "You want me to bring the gun[?]" Smith replied, "Yeah, bring it." Cathy was unsure whether Infant actually gave Smith a gun. Smith, Johnson, and Infant drove to where Smith had seen some Hat Gang members earlier. Infant tried to chase them on foot and told Smith, "Come on. Let's fight." But Smith told him to stop chasing them and said the Hat Gang members "didn't want to fight." They both got into the car with Johnson driving. Johnson told Smith, "It ain't worth it. Don't even do it." He responded, "No, I'm tired of these—I'm tired of these niggas." Johnson drove toward the Hat Gang members. On the way there, Smith cocked the hammer back on the gun. They saw four or five Hat Gang members exiting a residence and "they appeared to [be] mess[ing] around with their pants" or "pulling up their pants and all that." Smith thought they had a gun. He fired multiple shots and hit one of them. He kept shooting after one man fell.

Smith sold the gun he used in the shooting to another gang. Cathy knew about the shooting because Smith called him afterward. He asked for Cathy's advice because Cathy had "gone through a similar situation." Smith was crying and told Cathy he was "just protecting himself and his pregnant girlfriend."

### 6. *Other Evidence from the Police Investigation*

Investigators found 7 nine-millimeter casings on San Pedro Street south of 91st Street, and two live .22-caliber rounds on San Pedro Street north of 91st Street. The nine-millimeter casing furthest from Dixon's body was approximately 270 feet away from him. The nine-millimeter casing closest to him was approximately 192 feet away. The 7 nine-millimeter casings were fired from the same gun.

The investigators found the live .22-caliber rounds approximately six feet north of where Dixon was lying, in front of the house neighboring Turner's house. These two live rounds were cycled through the .22-caliber gun found in Turner's house, but they were never fired. They did not have any firing pin marks on them. The gun was in working condition and would have fired if someone had pulled the trigger.

8

Detective Kouri searched Williams's residence in October 2013. Among other things, he recovered a nine-millimeter loaded handgun from Williams's bedroom. Subsequent testing revealed the gun was not the one used in the shooting.

### 7. *Gang Expert*

Detective Christian Mrakich, the prosecution's gang expert, is a member of the LAPD's gang task force. He testified in part as follows. Witnesses are often uncooperative with police investigating alleged gang crimes because gang members are known to retaliate with violence against those who give information to the police. This applies even when witnesses are themselves members of a gang and may have information inculpating rival gang members. When one's own gang is the victim, he or she is expected to not cooperate with the police; the gang handles retaliation for the crime against it "on the street." For example, if one member of a gang is "jumped" or shot at by a rival gang, other members of the victim's gang join together and retaliate for that "disrespect." An affront to one member of the gang is an affront to the entire gang.

The primary activities of the Main Street Crips include the sale of narcotics, extorting businesses and celebrities, shootings, stabbings, beatings, robberies, and car jackings. When the prosecutor presented Detective Mrakich with a detailed hypothetical based on the facts of this case, he opined that the shooting was done for the benefit of a criminal street gang.

**PROCEDURE**

The amended information charged Smith and Williams with the murder of Dixon (count one), and the attempted willful, deliberate, and premeditated murders of Turner and Thomas (counts two and four), along with alleging gang and firearm enhancements (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b)-(e)(1)).[4] As previously noted, the jury found defendants guilty as charged and found Dixon's murder to be in the first degree.

---

[4] Count three related to another alleged attempted murder victim. The court granted defendants' motion to dismiss count three.

The jury also found the gang and firearm enhancements to be true. The court sentenced both defendants to total prison terms of 90 years to life. They timely appealed.

## DISCUSSION

### 1. Asserted Evidentiary Errors

Williams asserts the court erred in admitting two categories of evidence: Smith's out-of-court statements to Cathy, and evidence of the gun Detective Kouri found in Williams's home.

### a. Smith's Out-of-court Statements to Cathy

Williams and the prosecution both filed pretrial motions relating to Smith's out-of-court statements to Cathy. Williams moved to exclude Smith's statements to Cathy on Sixth Amendment grounds and hearsay grounds. The prosecution moved under Evidence Code section 402 to admit the statements. The court ruled that the statements were admissible under Evidence Code section 1230 (statements against penal interest) and they were reliable and trustworthy.

Williams's arguments that the court erred require us to examine two levels of hearsay—Smith's out-of-court statements to Cathy, and Cathy's out-of-court statements to Detective Mun, who interviewed Cathy about his information. As in the trial court, Williams advances several arguments based on his Sixth Amendment right to confrontation and hearsay rules. We review the court's rulings under state evidentiary law for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) The application of constitutional standards to the evidence represents a question of law we review de novo. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1154.) Applying these standards, we conclude the court did not err under any of Williams's arguments.

### i. Smith's Statements to Cathy

Williams contends the admission of Smith's out-of-court statements to Cathy violated his Sixth Amendment right to confrontation under *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*) and *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*). Additionally, he argues Smith's out-of-court statements constituted hearsay not subject to the exception for declarations against penal interest. (Evid. Code, § 1230.)

10

The *Aranda*/*Bruton* rule bars the admission of one defendant's out-of-court confession incriminating a codefendant, even if the court instructs the jury to consider the confession only against the declarant. (*Bruton, supra*, 391 U.S. at pp. 126, 135-136; *Aranda, supra*, 63 Cal.2d at pp. 529-530.) But the *Aranda*/*Bruton* rule applies only to testimonial statements under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). (*People v. Arceo* (2011) 195 Cal.App.4th 556, 574-575 (*Arceo*).) Williams concedes Smith's statements to Cathy were nontestimonial, and indeed we agree they were not testimonial within the meaning of *Crawford*. Smith made the statements during a phone conversation with his cousin, a fellow Main Street Crips gang member, because he was seeking advice on what to do. Courts routinely find these types of conversations between close friends or family members to be nontestimonial. (See, e.g., *People v. Cervantes* (2004) 118 Cal.App.4th 162, 174 [defendant's statements to a friend of long-standing who visited him at home to provide medical assistance were nontestimonial under *Crawford*].) Accordingly, there was no *Aranda*/*Bruton* error.

The court did not err under Evidence Code section 1230 either. "Evidence Code section 1230 provides that the out-of-court declaration of an unavailable witness may be admitted for its truth if the statement, when made, was against the declarant's penal interest. The proponent of such evidence must show 'that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.'" (*People v. Lucas* (1995) 12 Cal.4th 415, 462.) This hearsay exception does not apply "to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441.)

In the present case, Williams asserts the court should have redacted Smith's statement that Williams gave him the gun, arguing that where Smith obtained the weapon was irrelevant to Smith's penal interest. But the evidence was not that Smith said Williams gave him the gun. Instead, Cathy said Infant (Williams's gang moniker) asked Smith whether he wanted Infant to bring a gun, and Smith replied, "Yeah, bring it." Cathy then stated: "And Infant gave it to—*I don't know if*—yeah, Infant gave it to my

11

cousin." (Italics added.) After defense counsel went over these statements with Detective Mun, the detective said the "bottom line" was that Cathy was unsure whether Williams actually gave a gun to Smith.

In context, the statements Smith did make were specifically disserving to him. Smith's telling his confederate to bring a gun to the confrontation, when the confederate expressly asked whether Smith wanted it, went to Smith's state of mind—that is, the evidence gave rise to an inference of planning and premeditation on Smith's part. The reference to Williams in the statement was "inextricably tied to and part of a specific statement against penal interest," not "a collateral assertion that should have been purged from" Cathy's recollection. (*People v. Samuels* (2005) 36 Cal.4th 96, 121.) But assuming for the sake of argument the court should have redacted Williams's name, such an error was not prejudicial. Plenty of other evidence pointed to Williams as the confederate involved, most importantly Johnson's testimony. She also indicated Smith told Williams to bring "the thing," by which he meant a gun.

Williams also assigns error because Smith's statements, even if against his penal interest, did not satisfy the constitutional standard of trustworthiness. (*Arceo, supra*, 195 Cal.App.4th at pp. 575, 577 [statements genuinely against the declarant's penal interest may be admitted in a joint trial when they otherwise satisfy the constitutional requirement of trustworthiness].) "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334.)

Williams offers two reasons why Smith's statements to Cathy were not reliable or trustworthy. The first relates again to Smith's statements suggesting Williams gave him the gun. Williams argues Smith identified him as the source of the gun because Smith was retaliating against him for talking to the police first. (There was some evidence in Cathy's statements to the detective that Williams talked to the police and told them Smith

12

was the shooter, though this portion of the Cathy interview was not played for the jury.) The argument that Smith had retaliatory motives for identifying Williams as the source of the gun only makes sense if he thought Cathy would relay this information to the police. But nothing about the circumstances surrounding this conversation suggest Smith believed Cathy would go to the police. Smith did not attempt to shift blame for the shooting to Williams but only identified Williams as involved and strongly inculpated himself. Smith called Cathy for advice, and it was a private conversation between family members. "[T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures," such as the setting here. (*People v. Greenberger, supra*, 58 Cal.App.4th at p. 335.)

Williams claims Smith's statements were also unreliable because Cathy was the conduit through which they came, and Cathy talked to police in anticipation of receiving some benefit in his own (unrelated) criminal case. Williams suggests Cathy had a motive to lie and he was not credibly relaying Smith's statements. But the credibility of the *in-court witness*, Cathy, was "not a proper consideration" in determining the admissibility of hearsay declarations against interest. (*People v. Cudjo* (1993) 6 Cal.4th 585, 608.) Except in the rare instances when testimony "is physically impossible or its falsity is apparent 'without resorting to inferences or deductions[,]' [citations] . . . doubts about the credibility of the in-court witness should be left for the jury's resolution; such doubts do not afford a ground for refusing to admit evidence under the hearsay exception for statements against penal interest." (*Id.* at pp. 608-609.) The jury in this case heard the evidence suggesting Cathy had a motive to lie, it was able to observe Cathy on the stand, and it could make its own judgments about his credibility.

ii. *Cathy's Statements to Detective Mun*

Williams contends the court violated his Sixth Amendment right to confrontation because Cathy's out-of-court statements to Detective Mun were testimonial, and he did not have an adequate opportunity to cross-examine Cathy. (Respondent concedes Cathy's statements made during the interview with Detective Mun were testimonial.) He also contends that because Cathy effectively gave no testimony at trial, he did not testify

13

inconsistently with prior statements, and use of his prior "inconsistent" statements (Evid. Code, § 1235) to the detective constituted error.

We begin with the confrontation clause argument. The principal purpose of the right to confrontation is to secure the opportunity for cross-examination. (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1137.) "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. [Citation.] . . . [Citation.] The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." (*Crawford, supra*, 541 U.S. at p. 59, fn. 9.)

A witness who appears at trial but "refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness." (*People v. Rios* (1985) 163 Cal.App.3d 852, 864.) On the other hand, one who suffers from real or even feigned memory loss when questioned does not deny the defendant the right to confrontation. (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420.) That witness "is in fact subject to cross-examination, providing a jury with the opportunity to see the demeanor and assess the credibility of the witness, which in turn gives it a basis for judging the prior hearsay statement's credibility." (*Ibid*.) Cross-examination of one suffering asserted memory loss "'will of course not always achieve success, but successful cross-examination is not the constitutional guarantee.'" (*Ibid.*, quoting *United States v. Owens* (1988) 484 U.S. 554, 560.) "'[T]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."'" (*United States v. Owens, supra*, at p. 559, 564 [holding the confrontation clause is not violated by the "admission of an identification statement of a witness who is unable, because of a memory loss, to testify concerning the basis for the identification"].) When the out-of-court declarant "is present at trial and subject to unrestricted cross-examination," "the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements." (*Id.* at p. 560.)

14

*People v. Perez* (2000) 82 Cal.App.4th 760 (*Perez*) provides an apt analogy. In *Perez*, the pertinent witness was walking with the murder victim when the codefendants committed a driveby shooting. (*Id.* at pp. 762-763.) At trial, the witness "repeatedly answered 'I don't remember' or 'I don't recall' to virtually all the questions asked her about what she saw the night of the murder and what she told the police." (*Id.* at p. 763.) She answered some questions, however, relating to bias—she denied being a gang member, denied having a romantic interest in the investigating officer, and admitted she did not want to talk to defense counsel. (*Id.* at p. 766.) The officer testified that the witness told him she was afraid she would be shot if she testified and she would lie if the prosecution called her. (*Ibid.*) The court admitted her out-of-court statements to the officer as prior inconsistent statements under Evidence Code section 1235. (*Perez*, at p. 766.) On appeal, the defendant asserted the admission of her out-of-court statements violated the confrontation clause because he had no opportunity for effective cross-examination. (*Id.* at p. 764.) The *Perez* court disagreed: "The jury had the opportunity to observe her demeanor, and the defense cross-examined her about bias. Even though she professed total inability to recall the crime or her statements to police, and this narrowed the practical scope of cross-examination, her presence at trial as a testifying witness gave the jury the opportunity to assess her demeanor and whether any credibility should be given to her testimony or her prior statements. This was all the constitutional right to confrontation required." (*Id.* at p. 766.)

Here, Cathy's testimony was more akin to a feigned memory loss—that is, deliberate evasiveness—than a complete refusal to answer questions, like the cases on which Williams relies. Cathy initially refused to testify. But he returned the next day, took the oath, and answered questions. He testified he was not a gang member, was in custody because of a parole search, and did not speak to detectives about this case. He denied telling detectives he knew anything about a murder involving Smith and denied making certain statements about the details of the crime. He altogether denied that it was his voice on the recording of the interview with Detective Mun. He acknowledged telling the prosecutor earlier that he would not testify. Both defense counsel cross-examined

15

Cathy. Smith's counsel replayed the entirety of the clips the prosecutor had played from the interview with Detective Mun when she was attempting to impeach Cathy, and Cathy again denied making the statements. Cathy may not have explained the statements attributed to him to defendants' satisfaction. But his examination and cross-examination gave the jury the opportunity to observe his demeanor and assess whether he was credible. He appeared at trial. There was no confrontation clause violation.

Regarding the use of Cathy's prior statements as inconsistent with his trial testimony (Evid. Code, § 1235), the court did not err here either. Williams's notion that Cathy gave no testimony that could be considered inconsistent is simply incorrect—he flat out denied making the statements to police about which the prosecutor asked him. "Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . ." (*People v. Green* (1971) 3 Cal.3d 981, 988.) When the record supports a finding that the witness is being deliberately evasive at trial, the evasiveness is an implied denial of prior statements that authorizes the admission of the witness's prior statements under Evidence Code section 1235. (*Green*, at p. 989; *Perez, supra*, 82 Cal.App.4th at p. 764.) This record strongly supports a finding that Cathy was being deliberately evasive. He became upset when the prosecutor told him she was calling him at trial, and he said he would refuse to testify (which he initially did). At trial, he admitted he was in custody on the date of the police interview, but denied it was him on the recording and could not explain who was talking to detectives on the recording. Cathy's insistence that he never talked to the detectives—and the implication that they essentially concocted the whole thing and found someone to impersonate him for purposes of the recording—was far-fetched. The much more reasonable inference from the facts was that he did not want to repeat his prior statements and deliberately evaded doing so.

**b. The Gun Found in Williams's Home**

Williams argues the court prejudicially erred in admitting Detective Kouri's testimony that the detective found a handgun in Williams's home. Williams insists the evidence was irrelevant insofar as the handgun was not the one used in the charged

crimes. Contrary to Williams's argument, the court did not abuse its discretion in admitting the evidence.

Detective Kouri actually found two weapons during the search of Williams's home—a shotgun and the handgun. The court excluded evidence of the shotgun as irrelevant but ruled the handgun was relevant evidence.

When the prosecution relies on evidence that a specific type of weapon was used in the charged crime, the court errs in admitting evidence of other weapons found in the defendants' possession, to the extent such evidence shows not that the defendants committed the crime, but only that they are the sort of people who carry deadly weapons. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056.) Under such circumstances, the evidence of other weapons is, in effect, improper character evidence.

But to the extent the weapons are otherwise relevant to the crime's commission—not to demonstrate the defendants' character or disposition to commit a crime—they are admissible for these other purposes. (*People v. Cox* (2003) 30 Cal.4th 916, 956, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Smith* (2003) 30 Cal.4th 581, 614 (*Smith*).)

Such was the case here. The evidence of the handgun did not merely show Williams was the type of person who carried deadly weapons. The gun constituted circumstantial evidence of his intent and state of mind on the day of the shooting. The evidence showed Smith told Williams to bring a gun when they went to confront the Hat Gang members. Williams responded to this request by going inside his home and then returning to Smith's car. Although no trial witnesses saw a gun in Williams's hand that day, evidence that Williams actually had a gun in his home strengthened the reasonable inference that he went inside to retrieve a gun and bring it to the confrontation. Put otherwise, it strengthened the inference that he was armed and thereby intended to use deadly force against the rival gang members, regardless of whether the gun was in fact the murder weapon.

The court's ruling that the shotgun was irrelevant highlights the relevance of the handgun. The shotgun could not constitute circumstantial evidence that Williams was

17

armed with deadly force on the pertinent date. A shotgun would have been apparent on Williams's person as he came out of his house and jumped into Smith's car, whereas he could have easily concealed the handgun on his person. Because a juror could not reasonably infer Williams carried a shotgun to the confrontation, the shotgun was merely improper character evidence, and the court correctly excluded it.

This case is much like *Smith, supra*, 30 Cal.4th at pages 613-614, in which the court held evidence of a gun and ammunition not used in the charged killing was nevertheless circumstantially relevant to the defendant's state of mind. The defendant claimed the shooting was accidental and he did not intend to kill the victim. (*Id.* at p. 613.) He said he wanted to intimidate the victim only, and he chose the murder weapon because it was small and easily concealed. (*Id.* at pp. 613-614.) The other weapon found in his possession, however, was even smaller, and the ammunition found with the weapon did not fit it. (*Id.* at p. 614.) Thus, evidence that the defendant possessed a more easily concealed and unloaded gun that could have served to intimidate the victim just as well, but he chose to use the bigger, loaded gun, was relevant to the defendant's credibility. The evidence suggested he lied when he claimed that he did not intend to kill the victim and wanted only to intimidate. (*Ibid.*) Just as in *Smith*, the evidence of Williams's handgun was circumstantially relevant.

### 2. *Asserted Error Under* **People v. Chiu**

Relying on *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), Williams contends the jury instructions allowed the jurors to convict him of first degree murder under the natural and probable consequences theory of aiding and abetting, and the record cannot support a finding that his conviction stood on alternate valid grounds. We disagree. The record shows beyond a reasonable doubt that his conviction stood on the alternate theory of direct aiding and abetting, a legally valid theory.

In *Chiu*, our Supreme Court held "that an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences

18

doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Chiu, supra*, 59 Cal.4th at pp. 158-159.)[5]

The prosecutor in *Chiu* relied on both theories of liability for the aider and abettor, Bobby Chiu: that he was guilty of murder because he directly aided and abetted the perpetrator in the shooting death of the victim, and that he was guilty of murder because he aided and abetted the perpetrator in the target offense of assault or disturbing the peace, the natural and probable consequence of which was murder. (*Chiu, supra*, 59 Cal.4th at pp. 158, 160.) The court instructed the jury with CALCRIM No. 403 regarding the natural and probable consequences theory, with CALCRIM No. 520 defining second degree murder, and with CALCRIM No. 521 defining willful, deliberate, and premeditated first degree murder (premeditated murder). (*Chiu*, at pp. 160-161.) With respect to CALCRIM No. 521, the court "instructed that if the jury found defendant guilty of murder as an aider and abettor, it had to determine whether the murder was in the first or second degree. It then instructed that to find defendant guilty of first degree murder, the People had to prove that the perpetrator acted willfully, deliberately, and with premeditation, and that all other murders were of the second degree." (*Chiu*, at pp. 160-161.) The jury convicted Chiu of premeditated murder. (*Id.* at p. 158.)

After determining the instructions erroneously allowed the jury to convict Chiu of first degree murder under the natural and probable consequences doctrine, the court also determined the instructions amounted to prejudicial error. (*Chiu, supra*, 59 Cal.4th at pp. 167-168.) It explained: "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid

---

[5]     Our Supreme Court decided *Chiu* in June 2014. (*Chiu, supra*, 59 Cal.4th 155.) Defendants were tried in September 2014.

19

theory that defendant directly aided and abetted the premeditated murder." (*Id.* at p. 167.)

The court could not so conclude, based on the trial court's interactions with the jurors during their deliberations. The jurors sent a note during deliberations saying they were "'stuck on Murder I or Murder II,'" and asking what to do, and another note saying they were at a stalemate. (*Chiu, supra*, 59 Cal.4th at p. 167.) The trial court then questioned several jurors. The questioning revealed that one holdout juror could not follow or objected to the law on aiding and abetting, and she could not put Chiu "in the perpetrator's shoes" at the time of the murder. (*Id.* at pp. 167-168.) The holdout juror was "bothered by the principle of aiding and abetting and putting an aider and abettor in the shoes of a perpetrator." (*Id.* at p. 168.) The court removed the holdout juror and replaced her with an alternate, and the jury came back with a conviction. (*Ibid.*) Our Supreme Court observed that the holdout juror apparently could not attribute the perpetrator's premeditated murder to Chiu, indicating that the jury may have focused on the natural and probable consequences doctrine, and the holdout juror prevented a verdict of first degree murder based on that theory until she was removed. Thus, the court could not conclude beyond a reasonable doubt that the jury based the conviction on a different theory, i.e., the legally valid theory that Chiu directly aided and abetted the murder. (*Ibid.*)

Here, as in *Chiu*, the court instructed the jury on both the natural and probable consequences theory of murder and the direct aiding and abetting theory. The court instructed the jury on direct aiding and abetting with CALCRIM No. 401, which advised that the prosecutor had to prove the perpetrator committed the crime, the defendant knew the perpetrator intended to commit the crime, the defendant intended to aid and abet the perpetrator in committing the crime, and the defendant did in fact aid and abet the perpetrator's crime through words or conduct. The court also gave the same instructions noted in *Chiu*, CALCRIM No. 403 on the natural and probable consequences doctrine, CALCRIM No. 520 defining second degree murder, and CALCRIM No. 521 defining premeditated murder.

Still, we are convinced beyond a reasonable doubt that the jury based its verdict on the legally valid theory that Williams directly aided and abetted premeditated murder. (*Chiu, supra*, 59 Cal.4th at p. 167.)

First, unlike in *Chiu*, the jury instructions in this case did not direct the jurors to use someone else's mental state to find Williams guilty of premeditated murder. The pertinent instruction is CALCRIM No. 521. The version the court gave in this case may be meaningfully distinguished from the version in *Chiu*. *Chiu*'s version of CALCRIM No. 521 instructed the jury that the prosecutor had to prove the *perpetrator* acted willfully, deliberately, and with premeditation, while here, the same instruction said the prosecution had to prove "the defendant" acted willfully, deliberately, and with premeditation. This case's version of CALCRIM No. 521 stated: "The defendant has been prosecuted for first degree murder. [¶] You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved the defendant committed murder. [¶] The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation." CALCRIM No. 521 in our case was not defendant specific and thus did not distinguish between the perpetrator and the aider and abettor, and it thus did not direct the jury to use someone else's mental state ("the perpetrator") to find Williams guilty of premeditated murder.

Williams asserts this version of CALCRIM No. 521 did not cure the error in *Chiu*'s version of the same instruction. He argues the jury could not have understood CALCRIM No. 521 to apply to the aider and abettor because, by its terms, it applied only to the defendant who "committed murder," that is, the perpetrator. This argument is unconvincing. By its terms, the instruction told the jury "[t]he *defendant*" was guilty of premeditated murder only if "*he* acted willfully, deliberately, and with premeditation." (Italics added.) Both Williams and Smith were "the defendant." The instruction applied to both.

Second, unlike in *Chiu*, there were no questions from the jury or interactions suggesting that it was focusing on the natural and probable consequences doctrine to find Williams guilty of premeditated murder. Indeed, the jury sent only one question to the

21

court during its deliberations; it simply asked for Williams's verdict forms. The jury began deliberations at 9:00 a.m., sent the note at 10:20 a.m., and at 10:55 a.m. notified the court that it had a verdict.

Third, in her closing argument, the prosecutor argued to the jury that Williams was liable for premeditated murder under direct aiding and abetting principles, but told the jury that it could find Williams guilty of only second degree murder under the natural and probable consequences doctrine. For instance, after arguing Smith acted with the mental state required for premeditated murder, she argued:

"With Mr. Williams, the People's theory is that he aided and abetted in the murder. And we talked about this in jury selection. This was about acting as a team with the intent to facilitate, promote, encourage, instigate in the commission of a crime. He knew that Mr. Smith was going to murder, and his intent was to help him commit that murder. [¶] So what is the law under aiding and abetting? Again, two ways you can commit a crime: be guilty of a crime. You directly committed it or you aided and abetted someone. Under the law, it makes no difference. You are equally guilty either way. [¶] So what has to be shown for aiding and abetting? 'The perpetrator committed the crime.' The perpetrator here would be Mr. Smith. 'The defendant knew he was going to commit the crime.' That would be Mr. Williams. 'Before or during the crime, the defendant intended to aid or abet the perpetrator in committing the crime, and through his conduct, he did, in fact, aid and abet the perpetrator. [¶] And this is what the law says, ladies and gentlemen: You aid and abet if you know the person's unlawful purpose, and you specifically intend to aid them in completing that unlawful purpose." This theory of directly aiding and abetting premeditated murder remains viable according to *Chiu*. (*Chiu, supra*, 59 Cal.4th at p. 167.)

Later, the prosecutor addressed second degree murder and the natural and probable consequences doctrine:

"Now, I want to talk to you about second degree murder as it relates to Mr. Williams. And I bring this up because if you believe—if you believe that Mr. Williams really only went there believing that they were going to fight, and they weren't

22

gonna shoot, even though he was asked to bring a gun, if you believe that, he is still guilty of second degree murder. [¶] . . . [¶] So what the law says with natural and probable consequences is during the commission of the original crime—and the People's position is they went there. If you believe they went there for a fight, to challenge someone to a fight, to commit an assault with a deadly weapon, if you believe any of those things, and as a result of going there to commit those actions a murder was committed, as long as you believe that a fight or an assault with a deadly weapon, that it's foreseeable that committing those acts could lead to murder or trying to commit those acts could lead to murder, then Mr. Williams is on the hook for second degree murder." Accordingly, the prosecutor did *not* argue Williams was liable for premeditated murder under the natural and probable consequences theory.

Williams asserts the prosecutor's statements were not law, and the court told the jury it had to follow the instructions if her comments conflicted with the instructions. But her arguments were consistent with the court's instructing the jury on both theories of liability for Williams. Her comments did not conflict with the instructions. They merely explained to the jury how to apply the instructions—and did so in a legally valid way.

Fourth, strong evidence supported the prosecutor's argument that Williams directly aided and abetted premeditated murder. Williams and Smith were fellow gang members whose gang had been feuding recently with a rival gang. The rivals had attacked Smith's brother recently, also a fellow gang member. The gang culture demanded retaliation. Immediately after Smith had a run-in with the rival gang, he picked up Williams and told him to bring a gun. Williams went inside directly and came back out, giving rise to the reasonable inference that Williams listened to Smith and took a gun to the confrontation. At the very least, Williams knew Smith wanted his assistance with a deadly weapon. Smith told him they were going to fight the Hat Gang members. They went to where Smith had seen the rival gang members and Williams chased them and yelled curses at them. Smith called Williams back so that the two could get into the car with Johnson and follow their rivals, at whom Smith shot at least seven times. These

23

circumstances support a finding that Williams knew Smith intended to kill one or more of the rival gang members and intended to aid him in that respect.

In light of these four factors, we conclude beyond a reasonable doubt that the jury based Williams's premeditated murder conviction on direct aiding and abetting principles, which remains a legally valid theory according to *Chiu*.

## 3. *Asserted Errors in Jury Instructions*

Williams asserts errors in the court's instruction on direct aiding and abetting (CALCRIM No. 401), the refusal to instruct on perfect self-defense (CALCRIM No. 505), the instruction on contrived self-defense (CALCRIM No. 3472), and the "kill zone" portion of the attempted murder instruction (CALCRIM No. 600). Smith asserts the court erred in instructing the jury on reasonable doubt and its interplay with the degree of murder.

### a. Standard of Review

"We review a claim of instructional error de novo." (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) We do not determine the correctness of the instruction from a consideration of only part of an instruction or from only one instruction in isolation. (*People v. Fiore, supra*, at p. 1378.)

The court must give a requested instruction "if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) We independently review whether substantial evidence supported the giving of an instruction. (*People v. Waidla, supra*, 22 Cal.4th at p. 733.)

### b. Jury Instruction on Direct Aiding and Abetting

Williams maintains the court erred because it did not instruct the jury that he had to know the *full extent* of the perpetrator's purpose as a direct aider and abettor. Rather, the court instructed the jury that he had to know of the perpetrator's unlawful purpose. This argument fails to persuade us.

The pertinent instruction is CALCRIM No. 401. The instruction provides that the prosecutor must prove: (1) "[t]he perpetrator committed the crime;" (2) "[t]he defendant knew that the perpetrator intended to commit the crime;" (3) "[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;" and (4) "[t]he defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime." (CALCRIM No. 401.) It further instructed: "Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

As a preliminary matter, respondent asserts Williams forfeited this argument based on his failure to object below. Indeed, neither Williams nor Smith requested that the court modify CALCRIM No. 401 by adding "the full extent" before "the perpetrator's unlawful purpose." Williams argues that a court may review any instruction "even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Pen. Code, § 1259.) We will assume Williams has not forfeited the argument, but even so, it has no merit.

CALCRIM No. 401 was correct on the law. The instruction tracks the language of our Supreme Court in *People v. Beeman* (1984) 35 Cal.3d 547 (*Beeman*), which held: "We suggest that an appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*Id.* at p. 561.) Elsewhere, *Beeman* stated: "[T]he aider and abettor must share the specific intent of the perpetrator. . . . [Citation.] [A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the *full extent* of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Id.* at p. 560, italics added.) Williams seizes on this reference to the "full extent" of the perpetrator's criminal purpose. He claims there was

some evidence he knew of Smith's unlawful purpose of starting a fight, but there was no evidence he knew the full extent of Smith's purpose was to kill or attempt to kill the rival gang members.

Putting aside that we disagree with Williams's characterization of the evidence, CALCRIM No. 401 correctly instructed the jury on shared intent. When read as a whole, the instruction told the jury that to prove "the defendant is guilty of *a crime* based on aiding and abetting *that crime*, the People must prove" the defendant knew the perpetrator "intended to commit *the crime*," and he intended to aid and abet the perpetrator in committing "*the crime*." (CALCRIM No. 401, italics added.) Thus, the court instructed the jurors that, to find Williams guilty of premeditated murder based on aiding and abetting premeditated murder, the jury had to find Williams knew the perpetrator intended to commit premeditated murder. The pertinent unlawful purpose obviously related to whatever charged crime the jury was considering. We presume the jurors understood, correlated, and followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Inserting "the full extent" before the phrase "unlawful purpose" would have been superfluous.

### c. Refusal to Instruct the Jury on Perfect Self-defense

Williams charges error because the court refused to instruct on perfect self-defense, finding that substantial evidence did not support such instruction. The court, however, instructed on imperfect self-defense. Although the court erred in refusing to also give the perfect self-defense instruction, the error was harmless beyond a reasonable doubt.

Defense counsel requested that the court give CALCRIM No. 505 ("Justifiable Homicide: Self-Defense or Defense of Another"). CALCRIM No. 505 instructs that the defendant is not guilty of murder or attempted murder if he was justified in killing or attempting to kill in self-defense or defense of another. According to the instruction, lawful self-defense occurs when the defendant reasonably and actually believed there was imminent danger of death or great bodily injury to the defendant or another. (CALCRIM

26

No. 505.)  The instruction gives the prosecutor the burden of proving beyond a reasonable doubt that the killing or attempted killing was not justified as self-defense.

The court refused to give CALCRIM No. 505 because it believed there was no evidence Smith saw the victims with a gun, even though they may have been pulling up their shirts or pants, and there was no evidence of an imminent threat of death or great bodily injury when shooting from a distance of 270 feet, as Smith did.

The court instead gave CALCRIM No. 571 ("Voluntary Manslaughter: Imperfect Self-Defense . . .").  CALCRIM No. 571 instructs that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant acted in imperfect self-defense or imperfect defense of another.  Imperfect self-defense occurs when the defendant actually but unreasonably believed he or someone else was in imminent danger of death or great bodily injury.  (CALCRIM No. 571.)  The instruction gives the prosecutor the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense.  (CALCRIM No. 571.)

"The subjective elements of self-defense and imperfect self-defense are identical.  Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury.  To require instruction on either theory, there must be evidence from which the jury could find that appellant actually had such a belief.  This evidence may be present even though appellant did not testify or make a statement admitted at trial.  [Citation.]  If the trier of fact finds the requisite belief in the need to defend against imminent peril, the choice between self-defense and imperfect self-defense properly turns upon the trier of fact's evaluation of the reasonableness of appellant's belief.  Accordingly, if the evidence is sufficient to support instruction on self-defense, it is also sufficient to support instruction on imperfect self-defense." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.)

Here, the court found substantial evidence to support an actual but unreasonable belief in the need to defend against imminent death or great bodily injury and, accordingly, instructed the jury on imperfect self-defense.  Indeed, substantial evidence supported this instruction.  Johnson told police she saw the Hat Gang members digging in

27

their pants pockets like they were reaching for something, and Cathy reported that Smith saw something similar. According to Shaw, one of the Hat Gang members, Turner, took a gun outside. Police found two bullets that had been cycled through Turner's gun next to Dixon's body. Smith told Cathy he was trying to protect himself and his pregnant girlfriend. But if this evidence supported an actual belief that one of the Hat Gang members had a gun and was preparing to use it, then the jury should have determined the reasonableness of that belief in imminent death or great bodily injury. (*People v. Viramontes, supra*, 93 Cal.App.4th at p. 1262.) Under these circumstances, the court should have instructed on both perfect and imperfect self-defense to let the jury determine the reasonableness of Smith's belief.

Nevertheless, the court's instruction on imperfect self-defense and the jury's subsequent verdict convince us the error was harmless. Respondent asserts it is unclear whether the *People v. Watson* (1956) 46 Cal.2d 818 standard or the higher *Chapman v. California* (1967) 386 U.S. 18 standard applies. Williams asserts the *Chapman* standard applies. Even assuming *Chapman* governs, the error was harmless beyond a reasonable doubt. (*Chapman, supra*, at p. 24.) If the jurors believed Smith had an actual but unreasonable belief in imminent danger, they could have convicted him of voluntary manslaughter in accordance with CALCRIM No. 571. They did not. Instead, they found him guilty of the most serious offenses charged, premeditated murder and attempted premeditated murder. If the jurors rejected the claim that Smith had an actual but *unreasonable* belief in imminent danger and the need to defend with deadly force, we do not see how they would have found he had an actual and *reasonable* belief in imminent danger and the need to defend with deadly force. Nothing in Williams's briefing convinces us otherwise.

### d. Jury Instruction on Contrived Self-defense

Williams claims another instructional error with respect to CALCRIM No. 3472 ("Right to Self-Defense: May Not Be Contrived"). This instructed the jury: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Williams argues the instruction's categorical

28

language erroneously told the jury that defendants forfeited their claim to imperfect self-defense even if they intended only to provoke a nondeadly fistfight and their adversaries responded with deadly force.

He suggests the instruction foreclosed the jury from considering the following version of events: Smith and Williams engaged in a nondeadly fight with the Hat Gang members, and because Smith believed the Hat Gang members escalated the fight to deadly proportions by pulling a gun, Smith was entitled to claim imperfect self-defense. This claim of instructional error fails. Under the facts of this case, the jury was not prevented from considering imperfect self-defense.

To begin with, neither defendant objected when the court indicated it would instruct the jury with CALCRIM No. 3472. Nevertheless, we consider Williams's argument on the merits because a defendant's contention that an instruction misstated the law or violated the defendant's right to due process need not be preserved by objection. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)

We note our Supreme Court approved the correlated CALJIC instruction (CALJIC No. 5.55) in *People v. Enraca* (2012) 53 Cal.4th 735. Similar to CALCRIM No. 3472, CALJIC No. 5.55 stated: "'The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense.'" (*Enraca*, at p. 761.) The court observed CALJIC No. 5.55 and another instruction explained the law that defendants may not invoke imperfect self-defense when their own wrongful conduct creates circumstances under which their victim responds with legally justified force. (*Enraca*, at p. 761.)

We recognize that the categorical terms of CALCRIM No. 3472 may not be correct in all circumstances. Defendants may have a claim to self-defense if they provoke a fight using only nondeadly force, and their victim unlawfully responds with deadly force. (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180.) In other words, when an adversary suddenly escalates a confrontation to deadly violence in response to the defendants' use of nondeadly force, the defendants may still invoke self-defense. (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 273 ["Only when the victim

resorts to *unlawful* force does the defendant-aggressor regain the right of self-defense."].) Thus, defendants do not forfeit their right to self-defense in *all* cases in which they seek a fight intending to create an excuse to use force.

While CALCRIM No. 3472 read alone seems to foreclose a claim of self-defense whenever defendants provoke a fight, we must examine the instructions as a whole and presume the jury correlated the instructions. (*People v. Houston, supra*, 54 Cal.4th at p. 1229; *People v. Sanchez, supra*, 26 Cal.4th at p. 852.) And the court here correctly instructed the jury on when self-defense is still available to defendants who are the initial aggressors.

The court instructed the jury with CALCRIM No. 3471 ("Right to Self-Defense: Mutual Combat or Initial Aggressor"), which stated in pertinent part: "[I]f the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting." The jury was therefore aware that if Smith and Williams used only nondeadly force, and Smith believed the rival gang members were responding with sudden and deadly force, Smith could claim he responded with deadly force in imperfect self-defense. We do not think there is a reasonable likelihood the jurors applied CALCRIM No. 3472 in an impermissible manner, when read in context with CALCRIM No. 3471. (*People v. Houston, supra*, 54 Cal.4th at p. 1229.)

Williams relies principally on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), but as we shall explain, his reliance is misplaced. *Ramirez* acknowledged that ". . . CALCRIM No. 3472 states a correct rule of law in appropriate circumstances." (*Id.* at p. 947.) But the facts and arguments before the jury in *Ramirez* erroneously required the jurors to conclude the defendants had entirely forfeited any right to self-defense. (*Id.* at p. 953.) The evidence established two codefendants had provoked a fistfight with rival gang members. (*Id.* at p. 944.) One of the defendants testified that he stepped back from the melee and saw a rival walking toward him; he thought the rival had something black

30

in his hand that looked like a gun, and the rival raised his hand. The defendant then drew a gun from his sweatshirt pocket and fatally shot the rival. (*Id.* at p. 945.) The trial court instructed the jury with both CALCRIM Nos. 3471 and 3472. (*Ramirez*, at pp. 945, 946.)

The court found the prosecutor repeatedly misstated the law of self-defense during closing argument by arguing that, based on CALCRIM No. 3472, the codefendants' use of *any* force—"even nondeadly fisticuffs"—forfeited any claim of self-defense. (*Ramirez, supra*, 233 Cal.App.4th at pp. 943, 946, 950, 952.) The prosecutor repeatedly argued "'it doesn't matter'" whether, under CALCRIM No. 3471, the victim escalated a nondeadly conflict to deadly proportions. (*Ramirez*, at pp. 946, 949, 950, 952.) And when defense counsel argued in closing that the defendant regained a right to defend himself if he truly believed the gang rival had suddenly escalated the fistfight to a gunfight, the prosecutor responded by invoking CALCRIM No. 3472 and arguing, "'[Y]ou cannot have the princip[le] to mitigate from murder to voluntary manslaughter . . . when you are the one who created the circumstances to begin with. It makes sense. It's fair. It's just. More importantly, it's the law.'" (*Ramirez*, at pp. 946-947.) The prosecutor argued the categorical terms of CACLRIM No. 3472 trumped the right to self-defense explained in CALCRIM No. 3471. (*Ramirez*, at p. 948.) The *Ramirez* court returned to the repeated arguments by counsel numerous times, and her closing arguments were a substantial factor in the court's holding of prejudicial error. (E.g., *id.* at pp. 943, 947, 953.)

*Ramirez* is distinguishable. We do not have the substantially aggravating factor of the prosecutor repeatedly misleading the jury on the law—that is, telling the jury that it did not matter whether the victims escalated a nondeadly conflict to deadly proportions. The prosecutor did argue based on CALCRIM No. 3472 that Smith "shouldn't get imperfect self-defense" because he provoked a fight and contrived the situation. She further argued that defendants could not claim imperfect self-defense because the evidence was inconsistent with an actual belief in imminent danger. But the prosecutor did not tell the jury the Hat Gang members' conduct did not matter. She instead argued

31

Smith could not have actually believed in imminent harm from the Hat Gang members' conduct.

Defense counsel responded based on CALCRIM No. 3471 that defendants, as the initial aggressors, only tried to fight their rivals, and defendants could respond with deadly force because the Hat Gang members confronted them first with deadly force. The prosecutor did *not* say in rebuttal that it did not matter whether the rivals escalated the nondeadly conflict to deadly proportions. Instead, she argued again that the claim of imperfect self-defense was implausible because Smith could not have actually believed in imminent danger, based on the evidence. She additionally argued the claim that defendants only intended a physical fight was not credible. Unlike the prosecutor in *Ramirez*, the prosecutor here did not tell the jurors that defendants entirely forfeited their claim of imperfect self-defense under any circumstances and regardless of the victims' conduct. The jury was not prevented from fully considering defendants' claim of imperfect self-defense.

**e. Jury Instruction on "Kill Zone"**

Williams asserts that portion of CALCRIM No. 600 ("Attempted Murder") explaining the "kill zone" theory is "fatally flawed." Inasmuch as the instruction correctly states the law under California Supreme Court authority, we disagree.

CALCRIM No. 600 instructed the jury: "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person." Elsewhere, the instruction stated: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder of Thomas Turner and Edward Thomas, the People must prove that the defendant not only intended to kill Deshawn Dixon but also either intended to kill Thomas Turner and Edward Thomas, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Deshawn Dixon or intended to kill Thomas Turner or Edward Thomas by killing everyone in the kill zone, then you

32

must find the defendant not guilty of the attempted murder of Thomas Turner and Edward Thomas."

It is this latter-quoted portion of the instruction explaining the kill zone to which Williams objects. He contends (1) the instruction does not adequately define the kill zone ("What zone is that? Where is it, and how far does it extend? How can a jury determine who is in it and who is not?") and (2) does not adequately instruct that the defendant must have had a specific intent to kill.

Williams did not, however, object below when the court said it was giving the instruction, and neither did Smith. Defendants had the duty to request a clarifying or amplifying instruction if they believed the instruction necessitated it. (*People v. Estrada* (1995) 11 Cal.4th 568, 574.) We will nevertheless assume Williams did not forfeit the argument to the extent he argues the asserted error affected his substantial rights. (§ 1259; *People v. Smithey, supra*, 20 Cal.4th at p. 976, fn. 7.)

In any event, we find no error here. Williams stops short of arguing the kill zone theory of attempted murder is altogether wrong. The theory is a valid one, according to our Supreme Court. Attempted murder requires evidence that the defendant had a specific intent to kill. (*People v. Stone* (2009) 46 Cal.4th 131, 136.) The doctrine of transferred intent—"when the defendant intends to kill one person but mistakenly kills another"— does not apply to attempted murder. (*People v. Bland* (2002) 28 Cal.4th 313, 317 (*Bland*).) "The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Id.* at p. 328.)

That being said, the law "still permits a person who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them." (*Bland, supra*, 28 Cal.4th at p. 329.) "[T]he fact [that] the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within . . . the 'kill zone.' 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary

33

victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.'" (*Ibid.*) As our high court explained:

"[C]onsider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death." (*Bland, supra*, 28 Cal.4th at p. 330.)

*Bland* teaches that the kill zone theory is a way of determining whether the defendant had simultaneous intent to kill more than one person, even if the defendant primarily targeted one.

CALCRIM No. 600, as used here, did not misstate the law according to *Bland*. The first sentence of the challenged paragraph told the jury that a person may intend to kill one person while also intending to kill everyone in a particular kill zone—the concept of concurrent intent described in *Bland*. Applying this concept to the facts of the case, the instruction further advised the jurors that the defendant had to either intend to kill Turner and Thomas, or intend to kill everyone within the kill zone.

The instruction's failure to define kill zone further does not seem to us to render it fatally flawed. There is no precise definition of the scope of the kill zone, which "is necessarily defined by the nature and scope of the attack" in each case (*People v. Perez* (2010) 50 Cal.4th 222, 232) and therefore varies based on the circumstances of the case. Accordingly, in *Bland*, a flurry of bullets fired at a fleeing car that killed the driver and injured two passengers was sufficient to support two attempted murder convictions under the kill zone theory. (*Bland, supra*, 28 Cal.4th at pp. 318, 330-331.) In *People v. Perez*,

the indiscriminate firing of a single bullet at a group of eight individuals from 60 feet away was sufficient evidence to establish premeditated attempted murder as to one member of the group, though *not* seven more counts. (*People v. Perez, supra*, at pp. 230, 232.)

Moreover, the instructions adequately directed the jurors as to the required specific intent. The first part of CALCRIM No. 600 stated the prosecution had to prove the defendant "intended to kill" the attempted murder victims, and elsewhere reiterated the prosecution had to prove the defendant "either intended to kill Thomas Turner and Edward Thomas, or intended to kill everyone within the kill zone." Williams does not explain why adding the word "specifically" before "intended" would have made the instruction any clearer, when the instruction already identified the specific victims the defendant had to intend to kill. Williams has not shown the instruction was "fatally wrong."[6]

### f. Jury Instruction on Reasonable Doubt and the Degree of Murder

Smith raises the last instructional error for our consideration. He contends the court erred in failing sua sponte to instruct the jurors consistent with section 1097 and *People v. Dewberry* (1959) 51 Cal.2d 548, 555 (*Dewberry*). Specifically, he contends the court should have instructed that if the jurors had a reasonable doubt about which degree of murder applied, they had to give defendants the benefit of the doubt and convict them of the lesser degree. We find no reversible error.

Section 1097 states: "When it appears that the defendant has committed a public offense, or attempted to commit a public offense, and there is reasonable ground of doubt

---

[6]    The California Supreme Court granted review of the case on which Williams primarily relies for his argument, *People v. Sek* (2015) 235 Cal.App.4th 1388. (Review granted July 22, 2015, S226721.) The court deferred further action in *People v. Sek* "pending consideration and disposition in a related issue in *People v. Canizales*, [review granted Nov. 19, 2014,] S221958." (Supreme Ct. Minutes, July 22, 2015, p. 1187; see *People v. Sek*, *supra*, 235 Cal.App.4th 427, review granted July 22, 2015, S226721.)

in which of two or more degrees of the crime or attempted crime he is guilty, he can be convicted of the lowest of such degrees only." Consistent with section 1097, *Dewberry* observed "that when the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the jury must be instructed that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense." (*Dewberry, supra*, 51 Cal.2d at p. 555.)

We reject Smith's notion that the court was required to give the jury a special instruction tracking the language of *Dewberry* exactly, rather than the standard instructions the court gave. The court thoroughly instructed the jury regarding reasonable doubt and applying the standard to degrees of murder, as required by *Dewberry*. "The court has no duty to give an instruction if it is repetitious of another instruction also given." (*People v. Barajas* (2004) 120 Cal.App.4th 787, 791.)

The court instructed the jury with CALCRIM No. 220, stating in pertinent part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise."

Then, the court instructed with CALCRIM No. 520, which provided in relevant part: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521." CALCRIM No. 521 stated in relevant part: "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

The court further instructed the jury regarding circumstantial evidence of intent, including the following language from CALCRIM No. 225: "[B]efore you may rely on circumstantial evidence to conclude that the defendant had the required intent, you must be convinced that the only reasonable conclusion supported by the circumstantial

36

evidence is that the defendant had the required intent. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent was not proved by the circumstantial evidence."

In effect, these instructions together addressed the requirements of *Dewberry*. The instructions clearly informed the jurors that if they found defendants committed murder, they had to decide the degree of murder, and if they had reasonable doubt as to first degree murder that the prosecutor failed to overcome, the murder was in the second degree. As the court determined in *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1262, the court gave "the jury several generally applicable instructions governing its use of the reasonable doubt standard. All redounded to defendant's benefit in the sense that each required the jury, where it had a reasonable doubt as to *any . . . degrees*, to find defendant guilty of the . . . lesser degree, that is, to give defendant the benefit of any reasonable doubts it may have had."

Smith essentially ignores the instructions just discussed and instead focuses on CALCRIM No. 640, which instructed the jury on how to fill out the final verdict forms. For instance, the instruction directed the jurors: "If all of you agree that the defendant is not guilty of first degree murder but cannot agree whether the defendant is guilty of second degree murder, complete and sign the form for not guilty of first degree murder and inform me that you cannot reach further agreement." Smith contends that this instruction telling the jurors they must agree on whether or not the defendant is guilty "is no different than instructions which inform the jury that they must unanimously agree on a verdict and does not convey the concept embodied in Penal Code section 1097 . . . ." We tend to agree—other instructions, *not* CALCRIM No. 640, conveyed the concepts embodied in section 1097 and *Dewberry*. We find no error under either authority here.

### 4. *Sufficiency of the Evidence*

Williams argues there was insufficient evidence (1) that Smith did not act in imperfect self-defense and (2) that Williams directly aided and abetted Smith's crimes.

37

Smith argues there was insufficient evidence of (1) premeditation and deliberation on all the counts and (2) the attempted murder of Thomas.

**a. Standard of Review**

When reviewing a charge of insufficient evidence, "'an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Jurado* (2006) 38 Cal.4th 72, 118.) We "presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence." (*People v. Bloyd* (1987) 43 Cal.3d 333, 346-347.) The evidence of one witness, unless physically impossible or inherently improbable, generally suffices to prove a fact. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.) We do not resolve conflicts in the evidence or credibility issues, which are exclusively the province of the jury. (*People v. Young, supra*, at p. 1181.)

**b. Sufficient Evidence to Prove Premeditation and Deliberation**

First degree murder is a "willful, deliberate, and premeditated killing." (§ 189.) "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) But deliberation and premeditation do not necessarily require any extended period of time. (*People v. Perez* (1992) 2 Cal.4th 1117, 1127.) "'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .'" (*Ibid*.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, our Supreme Court identified three categories of evidence relevant to assessing premeditation and deliberation: (1) planning activity prior to the murder; (2) motive to kill, as gleaned from a prior relationship or conduct with the victim; and (3) manner of killing, from which may be inferred a preconceived design to kill. *Anderson* did not, however, purport to define the

elements of first degree murder or "establish an exhaustive list that would exclude all other types and combinations of evidence." (*People v. Perez*, *supra*, 2 Cal.4th at p. 1125.) "The *Anderson* guidelines are descriptive, not normative." (*Ibid.*)

We must decide whether substantial evidence exists supporting an inference that the killing and attempted killings occurred as the result of preexisting reflection rather than unconsidered or rash impulse. (*People v. Hughes* (2002) 27 Cal.4th 287, 371.) Smith contends "it is apparent" that the shooting resulted from rash impulse rather than preexisting reflection. At the same time, he concedes "the record contains some evidence of planning, motive, and manner of attack which, under some circumstances, might be indicative of premeditation."

Smith's concession has the right of it—there was substantial evidence from which a rational juror could infer premeditation and deliberation. Evidence of planning was present. Smith drove to Williams's home after his gang rivals "mad-dogged" him and told Williams to bring a gun for a fight, and they returned directly to the area where he had seen the rivals. This showed defendants considered the possibility of killing from the outset, and had significant time to consider it between Smith's initial run-in with the Hat Gang and the actual shooting. (*People v. Steele* (2002) 27 Cal.4th 1230, 1250 ["As to planning, the jury could infer that defendant carried the fatal knife into the victim's home in his pocket, which makes it 'reasonable to infer that he considered the possibility of homicide from the outset.'"].) There was also ample evidence of motive. Defendants' gang had been recently feuding with the Hat Gang, to which the victims belonged. The Hat Gang in general and the murder victim in particular had targeted Smith's brother. Smith and Williams thus had a motive to seek retaliation and revenge against the victims. (*People v. Martinez* (2003) 113 Cal.App.4th 400, 413 [evidence of gang rivalry constituted motive for shooting and supported premeditation and deliberation]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224 [same]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001 ["studied hatred and enmity" between rival gangs supported premeditation and deliberation in shooting].)

Moreover, the manner of the shooting here supported a reasonable inference of premeditation and deliberation. Smith and Williams chased the victims for a block or more on foot and then got into a car and continued the chase. Smith then fired at the victims seven times and continued firing even after Dixon fell. Such details reasonably show a preconceived design to kill. (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1463-1464, disapproved of on another ground by *People v. Mesa* (2012) 54 Cal.4th 191, 199 [manner of shooting evidenced premeditation and deliberation when the car in which the defendant rode made two passes by the victims, and defendant subsequently fired approximately 12 shots from the car, "far more than would occur from an unplanned or accidental firing"].) Reversal is unwarranted "'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"'" the convictions. (*People v. Hughes, supra*, 27 Cal.4th at p. 370.) That is manifestly not the case here.

**c. Sufficient Evidence to Prove No Imperfect Self-defense**

As CALCRIM No. 571 instructs, the prosecutor had the burden of proving beyond a reasonable doubt that the defendant did not act in imperfect self-defense or imperfect defense of another. Sufficient evidence supported the jury's verdict on this aspect.

Like we explained in a foregoing part, imperfect self-defense occurs when "a defendant killed another person because the defendant actually but unreasonably believed he was in imminent danger of death or great bodily injury." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) Fear of future harm, no matter how likely, will not suffice. (*Ibid.*) An imminent danger is immediate and present—that is, a danger with which one must instantly deal. (*Ibid.*) The jury may consider threats or harm perpetrated by the victim or someone associated with the victim in evaluating the defendant's beliefs. (CALCRIM No. 571.) The court instructed the jury here on these principles.

Williams relies on the evidence and inferences that support his theory of imperfect self-defense: Smith fired when he saw the rival gang members fiddling with their pants in a way that suggested they had guns in their waistbands; Turner had a gun, according to Shaw's story and the physical evidence of two live rounds next to Dixon's body; Smith

40

knew Dixon had assaulted Smith's brother recently; and, even if Smith started shooting from 270 feet away, the danger of his being shot was seconds away.

But we should not reverse merely because Williams can point to some evidence supporting his theory. The only question for us is whether substantial evidence supported the verdict, and it did. Much the same evidence that supported findings of premeditated murder and attempted murder supported the finding that Smith did not act in imperfect self-defense. Smith initiated a confrontation when he took Williams, a fellow gang member whom he told to bring a gun, to the location where he saw rival gang members. The two chased the victims from the nearby liquor store, and when Johnson picked them up in Smith's car, he permitted her to drive towards the victims rather than telling her to drive in the opposite direction. Smith told Cathy he was not "playing around" after the Hat Gang had attacked his brother, and when Johnson pleaded with him to stop, he said, "No, I'm tired of these . . . niggas." He cocked his gun as Johnson was driving and started shooting at a distance of 270 feet from the victims. These circumstances tend to belie the argument that he actually believed they had a gun and he was in imminent danger of death or great bodily harm. If he actually believed they had a gun, he was in a perfect position to flee by driving away. Instead, he showered them with bullets. From the totality of the evidence, a rational juror could find Smith sought out and intentionally shot at his victims in retaliation for the perceived insults against him, not because he actually believed he was in imminent danger of death or great bodily harm.

**d. Sufficient Evidence to Prove Direct Aiding and Abetting**

As discussed in a foregoing part, an aider and abettor must know the perpetrator's criminal purpose and intent to commit, or encourage or facilitate the commission of, the offense. (*Beeman, supra*, 35 Cal.3d at p. 560.) Because the defendant guilty of murder or attempted murder as an aider and abettor must intend to aid or encourage the perpetrator's intended killing, the aider and abettor must also intend to kill. (*People v. Lee* (2003) 31 Cal.4th 613, 624.) The prosecution may prove the defendant's intent or mental state through circumstantial evidence, as the court instructed the jury. (*People v. Hughes, supra*, 27 Cal.4th at p. 347; CALCRIM No. 225.)

41

Factors the trier of fact may consider in assigning aider and abettor liability include presence at the scene of the crime, failure to take steps preventing the crime, companionship, flight, and other conduct before and after the crime. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407; *People v. Garcia* (2008) 168 Cal.App.4th 261, 273.) One may aid and abet a crime without previously entering into a conspiracy to commit it. (*People v. Garcia, supra*, at p. 273.)

Here, Williams contends there was no evidence he knew that Smith intended to kill or attempt to kill the rival gang members. On the contrary, there was substantial evidence from which rational jurors could infer he knew of Smith's intent to kill. Importantly, Smith asked him to bring a gun to the confrontation with the rival gang, and one could infer that Williams complied when he responded to the request by going inside his home and then joining Smith in the car. Williams willingly rode to the site where Smith had seen the rival gang members earlier, and Smith told Williams he wanted to confront them. The two gangs had a recent history of violent confrontations. Williams got out of the car with Smith and chased the rivals, yelled and cursed at them, then returned to the car with him and did nothing to stop Smith when he cocked his gun and shot at least seven times. (*People v. Thompson* (2010) 49 Cal.4th 79, 115, 118 [sufficient evidence the defendant aided and abetted premeditated murder when he willingly rode in a car with accomplice and victim, jointly maneuvered the victim to an isolated area, and evidence gave rise to an inference that he supplied the gun used in the murder].) Even if Williams did not actually provide the gun to Smith, and each had his own gun, Smith's request that Williams bring one would have tipped Williams off to Smith's murderous intent. Thus, far from trying to dissuade Smith from committing the crime or withdrawing from it, Williams was an active participant. We reject Williams's assertion that there was no evidence he knew of Smith's murderous intent. The jurors could reasonably infer from the evidence that Williams not only knew of Smith's murderous intent, but shared in it and facilitated it.

42

### e. Sufficient Evidence to Prove Premeditated Attempted Murder of Thomas

Smith contends there was insufficient evidence he intended to kill Thomas because Thomas was a considerable distance from Dixon and Turner (the other two victims) and "not in the line of fire" or the "kill zone." We must disagree. Viewing the conflicting evidence in the light most favorable to the judgment, substantial evidence supported defendants' convictions for attempted murder of Thomas.

Thomas relies on his trial testimony, in which he said he was inside Turner's house when he heard gunshots, and when he came outside, shots were still being fired, and Dixon and Turner were near the corner. But his own prior inconsistent statements—made either the day of or just days after the shooting—undermined his trial testimony. According to Shaw, Thomas said he went outside at the same time as Dixon and Turner, and Smith pulled up in his car and rained shots on them. Along the same lines, Thomas told Detective Kouri he was at the corner of San Pedro and 91st Streets when shots were fired, not inside the house. While he insists his statement to Detective Kouri about his location "came out wrong," his statement was at best ambiguous, and the jury was entitled to interpret it in any reasonable manner.

The jury was also entitled to reject his inconsistent trial testimony for several good reasons. He was clearly an uncooperative witness on the stand. He openly admitted he did not want to testify but did so anyway. The expert gang witness testified about how witnesses are often uncooperative with authorities in gang cases, even when one is the victim of the crime, because the gang is expected to handle retaliation itself "on the street." Thomas also claimed a lack of memory regarding certain details on the stand, including whether he was at the corner as he told Detective Kouri, and how many shots were fired in total. He explained his lack of memory by saying the events happened a year ago, and his "mind" was "traumatized." If this were true, then the statements he made to the detective and Shaw right after the shooting were more reliable. In short, the evidence was sufficient to show that Thomas was in a group with Dixon and Turner when Smith fired on them, contrary to Smith's argument that "there was a complete absence of evidence that Thomas was standing on the corner with" them.

43

## 5. *Presentence Conduct Credits*

Respondent contends the court should not have awarded conduct credits to defendants. (Defendants do not respond to the contention.) The court awarded 374 days of actual credit and 56 days of conduct credit to Smith. It awarded 205 days of actual credit and 30 days of conduct credit to Williams. But persons convicted of murder may not accrue work time or conduct credits. (§ 2933.2, subds. (a), (c); *People v. Calles* (2012) 209 Cal.App.4th 1200, 1226.) We may correct this error in calculating presentence credits on appeal. (*People v. Duran* (1998) 67 Cal.App.4th 267, 270.) Accordingly, we shall direct the court to prepare amended abstracts of judgment that reflect only 374 days of actual presentence credit for Smith and only 205 days of actual presentence credit for Williams.

### DISPOSITION

The judgment is modified to reflect 374 days total of presentence custody credit for Smith, and 205 days total of presentence custody credit for Williams. So modified, the judgment is affirmed. The trial court is directed to prepare amended abstracts of judgment consistent with this opinion, and forward copies of the amended abstracts to the Department of Corrections and Rehabilitation.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

44